[Civ. No. 57571. Second Dist., Div. Three. Jan. 26, 1981.]

HARRY WARREN et al., Plaintiffs and Appellants, v.
TOM HERNDON et al., Defendants and Respondents.

COUNSEL

Stephen E. Penner for Plaintiffs and Appellants.

Schwartz, Steinsapir, Dohrmann & Krepack and Stuart Libicki for Defendants and Respondents.

OPINION

**COBEY, Acting P. J.**—Plaintiffs, Harry and Richard Warren, appeal from a summary judgment against them in their action for damages for slander against defendants, Tom Herndon and Retail Clerks Union Local 899 (hereafter 899). The appeal lies (Code Civ. Proc., § 437c), but we deem it to be generally without merit for reasons that follow:

FACTS

Plaintiffs Warren alleged in the first cause of action of their first amended complaint, filed on August 7, 1978, that on or about April 1, 1978, defendant Herndon spoke as follows at an 899 meeting about plaintiff Harry Warren:

"1. That upon Plaintiff's retirement from '899' he was authorized to receive a bonus of $9,000.00 for the purchase of a vehicle. Plaintiff took $9,300.00 from the Union Treasury without authority and thereby stole $300.00.

"2. That when RICHARD WARREN assumed Presidency of '899', pursuant to Board Resolution, he was to receive $100.00 per week less than that received by HARRY WARREN. Thereafter HARRY WARREN and RICHARD WARREN conspired so that RICHARD WARREN would receive the same compensation as HARRY WARREN.

"3. That HARRY WARREN on numerous occasions altered minutes of Executive Board meetings to serve his purpose, and thereafter filed said minutes in the Union records.

"4. That HARRY WARREN unlawfully took $200.00 from the Union to testify at an arbitration."

Plaintiffs Warren further alleged in their second cause of action of the pleading that defendant Herndon spoke as follows about Richard Warren at the same time and place:

"1. That when RICHARD WARREN assumed presidency of '899', pursuant to Board Resolution, he was to receive $100.00 per week less than that received by HARRY WARREN. Thereafter HARRY WARREN and RICHARD WARREN conspired so that RICHARD WARREN would receive the same compensation as HARRY WARREN.

"2. That RICHARD WARREN on numerous occasions altered minutes of Executive Board meetings to serve his purpose, and thereafter filed said minutes in the Union records."

In both causes of action the Warrens alleged that Herndon spoke as he did either knowing that he spoke falsely or in reckless disregard of the truth. We note that plaintiffs, who are father and son, are defendant Herndon's immediate predecessors as president of 899 and that Herndon defeated Richard Warren for the office in 1977.[1]

On February 5, 1979, defendants filed a motion for summary judgment herein on the ground that plaintiffs had no cause of action against them because of plaintiffs' inability to prove malice on the part of defendants. Defendants filed in support of the motion three declarations

---

[1]Harry Warren was president of 899 from January 1, 1960, through approximately May 31, 1976. Richard Warren served as president of 899 from approximately June 1, 1976, through December 31, 1977.

together with two partial transcripts of the minutes of an 899 membership meeting of April 19, 1978, and a photostat of a check payable to Harry Warren in the amount of $200 and dated November 30, 1977. These moving papers were opposed by four declarations filed by plaintiffs.

The trial court heard the motion on February 16, 1979, and thereafter granted it on the basis that defendants' statements were in fact true and plaintiffs were unable to prove malice under the applicable federal labor law standard. The summary judgment under appeal ensued.

DISCUSSION

1. *Plaintiffs' contentions*

Under Code of Civil Procedure section 437c a summary judgment should be granted only if there is no triable issue as to any material fact and the moving party is entitled to such a judgment as a matter of law. Plaintiffs contend that the trial court in granting defendants' motion for such a judgment used the wrong definition of malice, the evidence they offered in support of their motion was largely inadmissible, the motion was premature and triable issues of fact exist with regard to Herndon's state of mind in making the allegedly slanderous statements.

Two of these contentions do not require extended discussion. First, at the hearing of the motion, plaintiffs' then counsel stated "[t]he competency of their evidence is not in dispute." This statement on behalf of plaintiffs clearly waived any objection by them thereafter with respect to the admissibility of any relevant evidence filed in support of the motion. Second, under the governing statute, the already-mentioned Code of Civil Procedure section 437c, the motion was not made prematurely and the trial court did not abuse the discretion expressly granted it by the statute in refusing to continue the hearing of the motion, as requested by plaintiffs, in order to permit them further discovery of the minutes of executive board and membership meetings of 899 other than the minutes of the aforementioned membership meeting of April 19, 1978. This meeting was apparently the only 899 meeting that occurred near April 1, 1978, which is the date on which defendant Herndon allegedly made the statements at issue and plaintiffs never sought to

amend their pleading to cover statements by Herndon at other meetings of 899.[2]

## 2. *The proper definition of malice*

The trial court, in ruling on defendants' motion for summary judgment, used the legally correct and applicable federal labor law definition of malice. In *Linn* v. *Plant Guard Workers* (1966) 383 U.S. 53, 64-65 [15 L.Ed.2d 582, 591, 86 S.Ct. 657], the United States Supreme Court held that under the National Labor Relations Act defamatory statements in the course of labor disputes are actionable only if published with malice—that is, with either reckless disregard of whether the statements are false or with actual knowledge of their falsity—in order to prevent under the federal preemption doctrine unwarranted intrusion upon the free discussion in such disputes envisaged by the federal statute.

In *Letter Carriers* v. *Austin* (1974) 418 U.S. 264, 266, 273 [41 L.Ed.2d 745, 751, 755, 94 S.Ct. 2770] the United States Supreme Court extended its *Linn* holding to statements made in a union newsletter during a continuing organizational drive and found the necessary partial federal preemption in an applicable executive order favoring uninhibited, robust and wide-open debate in labor disputes.

According to the federal Labor-Management Reporting and Disclosure Act of 1959 (LMRDA) every member of any labor organization has the rights: (1) to meet and assemble freely with other members; (2) to express any views, arguments or opinions; and (3) to express at meetings of labor organizations his views upon candidates in an election of the labor organization or upon any business properly before the meeting, subject to the organization's established and reasonable rules pertaining to the conduct of its meetings. (29 U.S.C. § 411(a)(2).)

In *Salzhandler* v. *Caputo* (2d Cir. 1963) 316 F.2d 445, 446, 451, a case under the LMRDA of 1959, involving imposition of damages upon a union for disciplining a member for allegedly libelous statements re-

---

[2]Plaintiffs' trial counsel conceded at the hearing of the motion that the partial transcripts of the minutes of the April 19, 1978, membership meeting of 899 that defendants attached to defendant Herndon's declaration were accurate transcriptions of part of the tape of that meeting which defendants had. Plaintiffs apparently had another tape of the same minutes. Defendant Herndon specifically averred that what defendants attached to his declaration was the audible portions of the minutes of that membership meeting.

garding the handling of union funds by union officers, the court had this to say regarding the purposes of this federal statute. "The LMRDA of 1959 was designed to protect the rights of union members to discuss freely and criticize the management of their unions and the conduct of their officers. The legislative history and the extensive hearings which preceded the enactment of the statute abundantly evidence the intention of the Congress to prevent union officials from using their disciplinary powers to silence criticism and punish those who dare to question and complain." (*Id.* at pp. 448-449.) "[I]t would seem clearly in the interest of proper and honest management of union affairs to permit members to question the manner in which the union's officials handle the union's funds and how they treat the union's members. It is that interest which motivated the enactment of the statute and which would be immeasurably frustrated were we to interpret it so as to compel each dissatisfied and questioning member to draw, at the peril of union discipline, the thin and tenuous line between what is libelous and what is not. This is especially so when we consider that the Act was designed largely to curtail such vices as the mismanagement of union funds, criticism of which by union members is always likely to be viewed by union officials as defamatory." (*Id.* at pp. 450-451.) "The Congress has decided that it is in the public interest that unions be democratically governed and toward that end that discussion should be free and untrammeled and that reprisals within the union for the expression of views should be prohibited." (*Id.* at p. 451.)

It seems clear to us that the portion of the LMRDA of 1959, which we have quoted, requires in the situation before us the same partial federal preemption which was applied in *Linn* and *Austin*. This is also the message of the dictum expressed by our unanimous Supreme Court in *Gregory* v. *McDonnell Douglas Corp.* (1976) 17 Cal.3d 596, 600 [131 Cal.Rptr. 641, 552 P.2d 425]; see also *Hotel & Restaurant Employees etc. Union* v. *Anaheim Operating, Inc.* (1978) 82 Cal.App.3d 737, 757 [147 Cal.Rptr. 510].) Accordingly, we hold that the allegedly slanderous statements that Herndon made in the 899 membership meeting of April 19, 1978, concerning plaintiffs, are not actionable unless he made them either knowing that they were false or in reckless disregard of their possible falsity.[3]

[3]We note that Herndon's statements were made under circumstances bringing them within the qualified privilege of Civil Code section 47, subdivision 3.

This special definition of malice was, of course, taken from *New York Times Co.* v. *Sullivan* (1964) 376 U.S. 254, 279-280 [11 L.Ed.2d 686, 706, 84 S.Ct. 710, 95 A.L.R. 2d 1412]. (See *Linn* v. *Plant Guard Workers, supra*, 383 U.S. at p. 65 [15 L.Ed.2d at p. 591].)

### 3. *The summary judgment under appeal was proper.*

■ The declarations together with the attachments thereto establish that no triable issue of material fact exists with respect to defendants' malice, as just defined, in the making by Herndon of the allegedly slanderous statements concerning plaintiffs and that, therefore, defendants were entitled to the summary judgment they obtained as a matter of law. At the aforementioned 899 membership meeting of April 19, 1978, a supporter of plaintiffs asked Herndon for specific examples of unauthorized changes in the minutes of 899. Herndon replied that one such change involved the resolution, appearing in the minutes of executive board meeting of May 24, 1976, authorizing the purchase of a Mercury Marquis for plaintiff Harry Warren at a price not to exceed $9,000. Subsequently the minutes of this meeting were changed by omitting mention of the specific model of the automobile to be purchased and by raising the limit on its price to $9,300. Herndon explained in his declaration that he personally attended this meeting of the executive board as the then secretary treasurer of 899 and that in that capacity he thereafter read the minutes of this meeting to the membership of 899 on several occasions in the latter part of 1976. He further averred in his declaration that when he checked these minutes in May 1977 he found that they had been changed in the manner indicated.

At this same April 19, 1978, meeting of 899 Herndon stated that the payment by 899 of $200 to plaintiff Harry Warren, who was then receiving retirement benefits from the union, for testifying at an arbitration in late 1977 in Oxnard was improper. The basis for this statement by Herndon was a provision in the union constitution, of which Herndon apparently was then aware, that such a retiree could not receive any reimbursements for services performed for the union or its locals except for reasonable expenses incurred. According to Herndon, the minutes of the executive board, which he reviewed, showed that the $200 payment was not made for reimbursement for Warren's expenses in connection with the arbitration.

Finally, at this same membership meeting of April 19, 1978, Herndon cited, as a second example of 899 minutes being changed, another executive board resolution adopted at the aforementioned executive board meeting of May 24, 1976. This resolution fixed plaintiff Richard Warren's starting salary as president of 899 at $100 a week less than the salary his father, plaintiff Harry Warren, had been getting. Herndon averred that Richard Warren thereafter instructed him not to read

at membership meetings the entries in the aforementioned executive board minutes regarding the $9,000 limit on the purchase price of the automobile 899 bought for Harry Warren as a retirement gift and the fact that Richard Warren's starting salary had been set at $600 a week. Herndon also averred that when he inspected the minutes months later they showed a starting salary for Richard Warren of around $660 a week.

The declarants of the two other declarations filed in support of defendants' motion for summary judgment averred that each had attended the aforementioned executive board meeting of May 24, 1976, and that the averments in Herndon's declarations with respect to what happened at that meeting were accurate to the best of their recollections.

It is apparent from the foregoing that Herndon did not make the allegedly slanderous statements concerning the Warrens either knowing them to be false or with a reckless disregard of whether they were true or false. Furthermore, plaintiffs' declarations filed in opposition to the motion for summary judgment did not create any triable issue as to Herndon's state of mind in this respect. Harry Warren simply averred in effect that Herndon's statements with respect to the $200 payment and the change in the minutes regarding his retirement gift were false. The counter declarations of the other two union members did not go even this far. They merely recited whatever they allegedly heard at the union meetings. In short, none of the three declarations raised any triable issues of material fact regarding Herndon's state of mind in making the allegedly slanderous statements.[4] They did not even suggest that Herndon made these statements either knowing them to be false or in reckless disregard of their truth or falsity. In other words, they did not create any factual issue with respect to Herndon's malice in making the statements at issue. This being so, defendants were entitled as a matter of law to the summary judgment they received in this action.

The judgment under appeal, however, must be modified by striking therefrom the following words: "because defendants' statements were in fact true and plaintiffs are unable to prove malice under the Federal Labor Law standard which must be applied in this action," and substi-

---

[4]The fourth declaration filed in opposition to defendants' motion for summary judgment was by plaintiffs' then counsel and dealt only with the issue as to whether defendants' motion was premature.

tuting therefor the following language: "because no triable issue exists as to any material fact and defendants are entitled to summary judgment as a matter of law.

## DISPOSITION

The summary judgment under appeal is modified as just indicated. As so modified it is affirmed. Costs on appeal are awarded to respondents.

Allport, J., and Potter, J., concurred.